```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE SOUTHERN DISTRICT OF TEXAS

 3                          HOUSTON DIVISION

 4    UNITED STATES OF AMERICA                 4:19-cr-1910
                                               [4:19-cr-0815]
 5

 6    V.                                       October 18, 2019
                                               Houston, Texas
 7

 8    SILVANO VILLANUEVA,
      JAIME JESUS VAZQUEZ
 9              Defendants

10

11            PRELIMINARY EXAMINATION / DETENTION HEARING

12               TESTIMONY OF AGENT DARRYL SOBIN

13             BEFORE THE HONORABLE FRANCES H. STACY

14                UNITED STATES MAGISTRATE JUDGE

15    APPEARANCES:

16    For the United States             Jennifer Stabe, AUSA
                                        U. S. Attorney's Office
17                                      1000 Louisiana
                                        Suite 2300
18                                      Houston, Texas 77010

19    For Defendant Silvano Villanueva, Jr.   John M. Parras
                                        Attorney at Law
20                                      1390 Eudora
                                        Denver, Colorado 80220
21

22    For Defendant Jaime Jesus Vazquez       Andrew J. Williams
                                        Attorney at Law
23                                      1521 Green Oak Place
                                        Suite 140
24                                      Kingwood, Texas 77339

25    Proceedings from official electronic sound recording;
      transcript produced by court approved transcriber.

      DIGITAL SCROLL TRANSCRIPTION                  281.382.9862
```

1   Court Clerk                         Beverly White

2   Interpreter                         Ramon Del Villar

3   Electronic Recording                Shoshana Arnow
        Operator                        U. S. District Clerk's
4                                           Office
                                        515 Rusk
5                                       Houston, Texas 77002

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           INDEX

2                                                     <u>Page</u>

3  <u>WITNESS FOR THE GOVERNMENT</u>:

4       Agent Darryl Sobin

5          Direct Examination by Ms. Stabe        7
           Cross Examination by Mr. Parras        26
6          Cross Examination by Mr. Williams      34
           Redirect Examination by Mr. Stabe      42

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Excerpt of proceedings.)

2          (Proceedings through Interpreter.)

3               THE COURT:  All right.  The next case, 2019-19, U. S.

4    versus Silvano Villanueva and Jaime Jesus Vazquez

5               MS. STABE:  Yes, Your Honor, Jennifer Stabe for the

6    United States.

7               MR. PARRAS:  Good morning, Your Honor.

8               THE COURT:  Good morning, Your Honor.

9               MR. PARRAS:  John Parras here for Mr. Villanueva.

10              MR. WILLIAMS:  And Andrew Williams for

11   Mr. Jaime Vazquez.

12              THE COURT:  Very good.

13              MR. WILLIAMS:  May I have a moment, Your Honor?

14              THE COURT:  You certainly may.

15              THE INTERPRETER:  Ready, Your Honor.

16              THE COURT:  Thank you.

17                   And the Official Court Interpreter is

18   translating the proceedings into the Spanish language for

19   Mr. Vasquez?

20              THE INTERPRETER:  Yes.

21              THE COURT:  And we are having a Probable Cause

22   hearing and a Bail hearing this morning, correct?

23              MS. STABE:  Yes, Your Honor.

24              MR. WILLIAMS:  Yes, Your Honor.

25              MR. PARRAS:  Yes, Your Honor.

1             I did want to make Your Honor aware of

2   something.

3             Mr. Vasquez' family is in the process of hiring

4   Juan Guerra.  However, he's in Del Rio right now I'm told by

5   his secretary at another Detention hearing.  They asked me

6   to ask you –

7             THE COURT:  He's not going to make it today.

8             MR. PARRAS:  I'm sorry?

9             THE COURT:  He's not going to make it here today.

10            MR. PARRAS:  He's not going to be here today.  No.

11            THE COURT:  Right.

12            MR. PARRAS:  He'll be here Tuesday, but they wanted

13  me to ask you if they would – if you would carry the hearing

14  until Tuesday.  That's what his secretary is telling me,

15  because then she said that he was going to call the Court but

16  Beverly said that she never heard from her.

17            THE COURT:  Did we get a call, Beverly?

18            COURT CLERK:  I've been in the courtroom since 8:30

19  this morning; we had court starting at 9:00.  I didn't receive

20  a phone call.

21            THE COURT:  Okay.

22            MR. PARRAS:  But the Prosecutor has also told me that

23  the Agent is going to be gone for a couple of weeks.

24            THE COURT:  For a couple of weeks?

25            MS. STABE:  Yes. Your Honor.  And he told me after

1  today he will be out of town for two weeks, unavailable to

2  come for a hearing.

3           THE COURT:  Okay.

4               What's your position?

5           MR. PARRAS:  We're ready to proceed, Your Honor.

6           THE COURT:  I think we should proceed, because we

7  don't have an appearance of the lawyer, new lawyer yet.  He

8  hasn't contacted us, and this is not a very substantial

9  proceeding as far as the merits of the case.  It just has to

10 do with probable cause and bail.

11              So, I'm very happy to let a lawyer that is

12 retained to substitute in place of the court appointed lawyer;

13 especially at an early stage of the proceeding that – that

14 will be granted if your law- -- if Mr. Guerra moves to

15 intervene and represent you, that will be granted.

16              But as far as today's hearing, I'm not going to

17 reschedule it, because the Government's witness won't be

18 available next week.  The co-Defendant is ready to proceed,

19 and I think your current lawyer is ready to proceed, if need

20 be.

21           MR. WILLIAMS:  Yes, Your Honor.

22           THE COURT:  So, we will just go ahead and have the

23 hearing.  And if there's some reason to contest the results of

24 today's hearing, your lawyer will be allowed to do that; your

25 new lawyer will be allowed to do that.  Okay?

 1               So, we will have a seat please at the counsel
 2 table next to your lawyers.
 3               And the Government may call its first witness.
 4          MS. STABE:  The Government calls their Agent,
 5 Darryl Sobin.
 6          THE COURT:  Please come forward and be sworn.
 7     (Witness sworn.)
 8          AGENT SOBIN:  I do.
 9          COURT CLERK:  Thank you.
10               Take a seat on the witness stand.
11          THE COURT:  Beverly, is there a way to find out if
12 Mr. Guerra has made a Notice of Appearance in this case?
13          COURT CLERK:  I just checked the docket sheet, and
14 there is not a Notice of Appearance.
15          THE COURT:  He has not made a Notice of Appearance.
16               Okay.
17          COURT CLERK:  Do you want to take care of the other
18 case, Judge?
19          THE COURT:  Yes.
20     (Pause in the proceedings at 10:13:56 a.m. to 10:19:04
21 a.m.)
22          THE COURT:  Now, we'll go back to our Case No.
23 19-1910, U. S. versus Villanueva and Vazquez.
24               The witness has been sworn in.
25               Please make good use of the microphones wherever

 1  you are sitting or standing when you're questioning the

 2  witness.

 3          MS. STABE:  May I proceed, Your Honor?

 4          THE COURT:  Yes.

 5      DARRYL SOBIN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

 6                     DIRECT EXAMINATION

 7  BY MS. STABE:

 8  Q   Could you please state your name for the record?

 9  A   Darryl Sobin.

10  Q   And, Agent Sobin, what do you do for a living?

11  A   I'm a federal agent for Drug Enforcement Administration.

12  Q   Okay.

13              How long have you been with the DEA?

14  A   Just shy of 19 years.

15  Q   Can you just give a brief background of where have you

16  been stationed throughout your career?

17  A   I came on in New York for approximately seven and a half

18  years.  I followed that with another seven years in Mexico and

19  now five years here.

20  Q   In Houston?

21  A   In Houston.

22  Q   Okay.  And as an agent with the DEA, what are your general

23  duties?

24  A   Arrest and enforce drug laws.

25  Q   Okay.  And can you speak up just a little bit?

1    A    Sure.  Sorry.

2    Q    Okay.

3           THE COURT:  If you just don't mind talking right into

4    the microphone.  It makes so much better record.  It doesn't –

5    it's not instinctive, but if you do it, it will really help

6    us.

7           THE WITNESS:  Yes, Your Honor.

8           THE COURT:  Thank you.

9    BY MS. STABE:

10   Q    So, Agent Sobin, during your career with the DEA, do you

11   frequently use Confidential Sources?

12   A    Absolutely.

13   Q    Okay.  And in the case we're here to discuss today, at

14   some point around September 4, 2019, were you working with a

15   Confidential Source during an investigation into the drug

16   trafficking activities of Silvano Villanueva, Jr.

17   A    Yes, I was.

18   Q    And around September 4th, 2019, I guess – did you get

19   information from your Confidential Source that kind of started

20   why we're here today?

21   A    Yes, I did.

22   Q    Okay.

23           Can you tell the Court basically the beginning

24   of the investigation, September 4, 2019, what did you learn?

25   A    Sure.

1          On or about September 4th, I was made aware that

2    Silvano Villanueva had wired money to our source up in Houston

3    for the purposes of the journey down south to McAllen, at

4    which point he was sent to McAllen to meet with Villasenor in

5    furtherance of registering a tractor trailer to move

6    narcotics, cocaine specifically, to either Carolinas, Atlanta,

7    Ohio and/or Houston.

8    Q    Okay.

9          And did your CS then actually go down to the

10   McAllen, Hidalgo area of Texas?

11   A    Yes, late on the 4th he left, was picked up in Harlingen.

12   He took a bus down to Harlingen, was picked up by Villanueva

13   in Harlingen and brought to McAllen.

14   Q    Okay.

15   A    Arriving on the 5th, early morning hours.

16   Q    And the – you stated that there was a wire transfer of

17   money to the CS; is that right?

18   A    On the 4th, correct.

19   Q    Okay.  And –

20   A    In the name –

21   Q    Who is the wire transfer from?

22   A    In the name of Silvano Villanueva.  That was the first

23   time we were made aware of his exact name.

24   Q    Okay.  So, there were identifiers on that wire transfer?

25   A    Absolutely.

1    Q    And did you then take that full name, Silvano Villanueva,

2    Jr., and run them through your law enforcement data bases?

3    A    Yes, we did.

4    Q    Were you able to develop a suspect?

5    A    Yes, we did.

6    Q    Did you then show any photographs or images of

7    Silvano Villanueva, Jr. to your CS?

8    A    Yes, we did.

9    Q    Was the Defendant identified in this case?

10   A    Yes, he was positively identified.

11   Q    Okay.  And do you see he same person, Silvano Villanueva,

12   Jr., in the courtroom today?

13   A    Yes, I do.

14   Q    Could you please point to him and identify an article of

15   clothing he's wearing?

16   A    The gentleman to my right with the green jumpsuit.

17   Q    Okay.

18   A    Behind the gentleman in the blue suit.

19   Q    Okay.

20            May the record reflect, Your Honor, the witness

21   has identified the Defendant Villanueva?

22            THE COURT:  Is he wearing headphones?

23            THE WITNESS:  No, the other one.

24            THE COURT:  Okay.  The record will so reflect.

25            THE WITNESS:  Okay.

1    BY MS. STABE:

2    Q   So, your CS went down to the McAllen area of Texas around

3    September 4th to 5th; is that right?

4    A   Correct.

5    Q   Okay.  So, once the CS arrived in McAllen, what did you

6    learn that the CS did with the Defendant Villanueva?

7    A   They were in the process of registering and repairing,

8    making ready a 2010 burgundy Freightliner tractor trailer.

9    Q   So, a big eighteen wheeler?

10   A   Correct.

11   Q   Okay.

12                And what were the steps they took to make it

13   ready for a transport?

14   A   They needed to change tires, paint.  They registered a

15   company called Blessed Sevens – Blessed Sevens, depending on

16   how you pronounce it.  Made logos for the doors.  In addition,

17   they had to re-register the trailer; the trailer was re-

18   registered on the 12th – on or about the 12th.

19                On the 13th, there was an issuance of plates for

20   the tractor, which would then change, because they were

21   improper – the plates were incorrect, but that was the first

22   issuance of dates for the tractor itself.  So, between the

23   12th and the 13th, a lot of that work got done, as well as

24   insurance and registration.

25   Q   Okay.

1           And who was it that was helping the CS prepare

2   this tractor trailer?

3   A    Silvano Villanueva.

4   Q    Okay.

5           And the new license plate and registration whose

6   name was that in?

7   A    In the Confidential Source's.

8   Q    Okay.  So, after September 13th or between September 10th

9   and 13th, were there any conversations between the CS and

10  Villanueva about this narcotics transaction?

11  A    Yes, at that point it was up in the air if it was going to

12  be 42 kilos was the number that was bandied about.  However –

13  and also was talked about there was a potential for two loads

14  to be transported, which according to Villanueva was not

15  some- -- was something that was frowned upon but if the CS was

16  willing to do it, he would like to see that happen.  The CS

17  made himself or herself available, said they would do it if

18  both loads were ready.

19  Q    Okay.  On or about September 16th, 2019, did the CS

20  receive anything from Defendant Villanueva?

21  A    Yes, on the 16th, he received – she received two duffle

22  bags containing what was said to be by Villanueva to be –

23  direct from Villanueva to be 35 kilograms of cocaine destined

24  for Atlanta in a nondisclosed location, which he would know or

25  she would know as the route was traveled.

1    Q    Okay.  And so, these duffle bags of cocaine were handed

2    directly from Villanueva to the CS?

3    A    Yes, they were.

4    Q    Okay.  Is there anything else that Villanueva did to

5    facilitate the transportation of this cocaine?

6    A    He also organized the cover load, which wa- -- which is

7    what they would - the - a truck can't run empty from here up

8    north.  It would be suspicious.  So, a load of broccoli was

9    set up by Villasenor to be picked up by the CS.

10   Q    Okay.

11              And you said, "Villasenor," do you mean

12   Villanueva?

13   A    Villanueva - excuse me - yes, Villanueva.

14   Q    Okay.

15              So, Villanueva set up the load of broccoli, the

16   cover load, and where did the CS go to pick that up?

17   A    23rd and Produce Road in Hidalgo.

18   Q    Okay.  And after the CS picked up the cover load and the

19   duffle bags of what Villanueva said was cocaine, what did the

20   CS then do?

21   A    He was immediately - she was immediately met by agents of

22   the McAllen office, DEA office, where they took custody of the

23   two bags and identified positively field tested for cocaine.

24   The logos on the cocaine were that of triple sevens, not

25   unlike the logo Blessed Sevens.  And then the CS was sent

1    north.

2    Q    Okay.  Was the cocaine weighed at that point?

3    A    It was weighed.  The gross weight was 45.3 kilograms.

4    Q    Okay.  Did the CS receive any kind of documentation from

5    agents that discussed the seizure?

6    A    Yes.  Shortly thereafter, he – he or she were given a

7    seizure document from DHS/CBP stating that the – they had

8    interdicted at the Checkpoint in Falfurrias 45.3 kilograms

9    from the trailer of the vehicle.

10   Q    Okay.  And at that point, what did your CS do?

11   A    That would be the 17th.  The CS traveled north to Houston,

12   arriving in Houston on or about the 17th with the trailer.

13   Q    Okay.  And why did the CS then go to Houston?

14   A    Well, we ordered them to continue the route, as if to be

15   continuing the route toward where – where the product had to

16   be delivered, the cover load.

17   Q    Okay.  And so the CS was originally was supposed to go

18   through Houston?

19   A    Yes.

20   Q    And on or about September 17th, 2019, did the CS have a

21   conversation with Villanueva over the phone –

22   A    Yes, where –

23   Q    And what was the subject of that call?

24   A    He or she informed Villanueva that the merchandise had

25   been seized at the Checkpoint in Falfurrias.

1   Q    Okay.  And was a meeting set up at that time?

2   A    Shortly thereafter on the 18th a meeting was set up, yes.

3   Q    Okay.  And where was the location of that meeting?

4   A    The Love's Truckstop in Katy, Texas.

5   Q    Okay.  Did Agents establish surveillance at the Love's

6   Truckstop in Katy, Texas?

7   A    Yes, they did.

8   Q    Okay.  When Agents were there at the Love's Truckstop, did

9   you see the Defendant Villanueva?

10  A    Villanueva was seen as he was meeting with the CS in the

11  Love's Truckstop.

12  Q    Okay.  Was there a discussion in that Love's Truckstop

13  between the CS and Villanueva?

14  A    They walked to the back of the truckstop.  He explained –

15  the CS explained why the truck, the reefer, the refrigerated

16  portion of the truck was not keeping.  That was part of the

17  discussion, and he was also – he/she was also explaining the

18  circumstances regarding the seizure.

19  Q    Did the CS give any documents to –

20  A    Yes.

21  Q    -- Villanueva?

22  A    The CS provided the original document for the seizure.

23  Q    Okay.

24  A    From CBP.

25  Q    Was there anyone else that was noticed by agents that day

1  in the Love's parking lot or Love's complex?

2  A    Yes.  Subsequent to the CS's departure as Villanueva

3  exited the Love's, he entered a black Camry which bore a

4  temporary tag, and that black Camry was parked watching the

5  front of the Love's location.  And, yes, there was a driver in

6  that vehicle.

7  Q    Okay.

8          And at that time, did agents know who that

9  driver was?

10 A    No.

11 Q    Okay.  Later was that driver identified?

12 A    Yes, they continued to the back of the – of the Love's

13 where they both worked.  A mechanic was ordered for the reefer

14 or refrigerated portion of the truck.  Villanueva and the

15 driver continued to the back, drove around, drove the Camry to

16 the back of the location where photos were obtained and

17 subsequently shown to the – to the Infor- -- to the

18 Confidential Source.

19 Q    Okay.  So, at some point who is that driver identified as?

20 A    Jaime Vazquez.

21 Q    Okay.  Do you see Jaime Vazquez in the courtroom today?

22 A    Yes, I do.

23 Q    Can you please point to him and identify an article of

24 clothing that he's wearing?

25 A    The gentleman with – well, the green jumpsuit but also the

1  headphones.

2  Q   Okay.

3              May the record reflect the witness has

4  identified Defendant Vazquez.

5              THE WITNESS:  Thank you.

6              THE COURT:  The record will so reflect.

7  BY MS. STABE:

8  Q   After the meeting at the Love's Truckstop where both

9  Villanueva and Vazquez were there, what happened next after

10 that between September 18th and around October 10th?

11 A   There was a series of communications between the CS and

12 Villanueva during which a constant theme was trying to bring

13 the CS initially down to the Valley to meet to explain what

14 happened.  Then it became anywhere that a meeting could occur

15 there was a gentleman from Dallas supposedly that needed to be

16 told exactly face to face what had occurred.  It needed to be

17 a face-to-face meeting, but the common theme was a gentleman

18 from Dallas where the CS would answer more direct details as

19 to what went down.

20 Q   Okay.

21              And did they call this person the "Dallas guy"?

22 A   Yes.

23 Q   Okay.

24              At some point on September 29th, was there a

25 conversation between Villanueva and the CS where someone who

1  identified as the Dallas guy kind of got on the phone?

2  A   Yes.  Villanueva put another phone up to his phone via

3  speaker and that gentleman was the purported to be the

4  gentleman from Dallas.

5  Q   Okay.

6            But listening to the conversation, you don't

7  know for sure whose voice that was through all the

8  different –

9  A   Chan- --

10 Q   -- I guess phones being put up next to each other?

11 A   No, I do not.

12 Q   Okay.

13           On October 10th, 2019, did the CS arrange a

14 meeting between the person known as the Dallas guy and

15 Villanueva?

16 A   Yes, Villanueva.

17 Q   Okay.  Where was that meeting to take place?

18 A   The Richmond Travel Center or McDonald's.

19 Q   Okay.

20           And is that also in the Southern District of

21 Texas?

22 A   Yes, it is.

23 Q   Okay.  And what city was it in?

24 A   That's in Richmond.  I'm sorry.

25 Q   Okay.

1   A    Rosenberg – excuse me.

2   Q    Rosenberg?

3   A    Yes.

4   Q    What time was the meeting supposed to take place?

5   A    The meeting was supposed to take place at 12:30.

6   Surveillance was established at 12:15.  At approximately 1:09,

7   Mr. Villanueva arrived in his Camry.

8   Q    Okay.  And was there anyone else in that Camry?

9   A    Yes, Mr. Villanueva was the passenger in the Camry.

10  Q    Who is the driver?

11  A    Upon entry that was not known.  Subsequently, it was

12  Mr. Val- -- identified as Mr. Vazquez.

13  Q    Okay.

14               So, Agents see a black Camry pull in and

15  Villanueva is identified right away?

16  A    The license plate is registered to Mr. Villanueva.

17  Q    Okay.

18               And what does Mr. Villanueva do?

19  A    Mr. Villanueva – well, he places a call to the CS at

20  1:12 – well, 1:09 and it ends – yes, at 1:12 as he is entered

21  into the McDonald's.

22  Q    Okay.

23               And at that point is anything happening with

24  that black Camry?

25  A    The black Camry at that point has made multiple loops

1  around the parking lot as if to look for surveillance or other

2  oddities.

3  Q   Okay. Does the driver - or is the driver at that time

4  identified?

5  A   At that time?  Yes, Agents were able to see as doors were

6  opening and closing who was in the vehicle, and he was

7  identified as the same person from the Love's as Mr. Vazquez,

8  Q   Okay.  And once Villanueva got into the McDonald's were

9  there any more conversations between the CS and Villanueva by

10 phone?

11 A   Yes, witnessed - I say I witnessed firsthand the CS was

12 trying - it was basically told by Villanueva that the

13 gentleman from Dallas could not attend.  The CS stated that

14 the whole reason for this meeting was because he needed to

15 answer face-to-face with the gentleman from Dallas, not

16 Mr. Villanueva, and he would not appear if the gentleman was

17 not there.

18            This went back and forth for several minutes, at

19 which point surveillance units witnessed Mr. Villanueva return

20 to the vehicle.  A short time later the calls again are going

21 back and forth.  Mr. Villanueva is stating that he is alone

22 and not with anybody.

23            He then returns to the front of the McDonald's,

24 the exterior, not inside where the CS says, I'm leaving, if I

25 don't speak with someone.  I drove through there.  I saw there

1  was a person in the vehicle.  I know you're not alone.  At

2  that point, Mr. Villanueva exits the front or leaves the front

3  area of the McDonald's, returns to his vehicle, enters the

4  passenger side.  Conversations continue with Mr. Villanueva

5  and the CS.  Moments later Mr. Vazquez appears on the phone.

6  Q    Okay.

7              And since you guys had surveillance, Agents had

8  surveillance established, was there anyone else in that Camry

9  besides Villanueva and Vazquez?

10 A    Absolutely not.

11 Q    Okay.

12             And so, Villanueva his voice was on the phone

13 for a while; is that right?

14 A    Correct, multiple times.

15 Q    Okay.

16 A    Right.

17 Q    And then, at some point the voice clearly changed to

18 someone different?

19 A    Indistinguishably.  Correct.

20 Q    Okay.

21 A    Absolutely.

22 Q    And throughout your –

23 A    Indistinguishably.

24 Q    -- investigation, have you later had a chance to hear

25 Mr. Vazquez' voice?

1    A    Yes, I have.

2    Q    Okay.

3              And so, was it the same person on the phone when

4    the phone was passed as Mr. Vazquez?

5    A    Absolutely.

6    Q    Okay.

7              During that conversation between the CS and

8    Vazquez, what was the subject of that call?

9    A    The need to sit down and talk face to face.  Mr. Vazquez

10   stated in no uncertain terms that this looks bad; you must

11   have – if you think – the CS stated that he or she did not

12   want to meet, as, you know, felt there was a kidnap threat or

13   something like that.  And Mr. Vazquez stated that you must

14   have some guilt on your conscience or you must have done

15   something bad in order to feel this way.  We need to meet.  We

16   simply want to go over the details; we want to sit and talk.

17   This has gone on long enough, and then – to that effect.

18   Q    Was there a conversation about Vazquez having seen the

19   paperwork?

20   A    Yes.  The CS asked, you saw the paperwork.  There was no

21   trap in the truck.  This doesn't fall on me.  Mr. Vazquez

22   entered – answered that he indeed – he was aware of that, but

23   we needed to speak, to explain further the details.  But he

24   had seen the paperwork.

25   Q    Okay.

1      And at that point after that call, did Agents

2   end up detaining both Villanueva and Vazquez?

3   A   Yes, they did.

4   Q   Okay.  How were they identified that day, October 10th,

5   2019?

6   A   They had their licenses in their possession?

7   Q   Okay.  And so their names and photographs matched the

8   people that are charged in this case?

9   A   Yes, ma'am.

10  Q   And, Agent Sobin, in addition to being there at the scene,

11  did you also run several checks through databases on these two

12  Defendants?

13  A   Yes, we did.

14  Q   Okay.  Did you check Defendant Vill- -- Villanueva's Texas

15  Workforce Commission records?

16  A   Yes, I have.

17  Q   Okay.  Does Defendant Villanueva have any reportable

18  income or employment that shows up under Texas Workforce

19  Commission?

20  A   Not that I have seen, no.

21  Q   Did you also run a check of Defendant Villanueva's

22  criminal history?

23  A   Yes.

24  Q   And did you find any reportable convictions for

25  Defendant Villanueva?

1  A    Two marijuana smuggling charges; one in 2004, sentenced to

2  30 months, a hundred and thirty kilograms and that was out of

3  McAllen; and one in 2011 for 387 kilograms of marijuana; that

4  was 64 months and that is out of Houston.

5  Q    Okay.  And – so, Defendant Villanueva appears to have two

6  federal convictions for marijuana smuggling?

7  A    Yes, he does.

8  Q    Okay.

9               Did you run Defendant Vazquez' Texas Workforce

10  Commission records?

11  A    Yes, I did.

12  Q    Did Defendant Vazquez have any reportable income or

13  employment?

14  A    Not that I could verify, no.

15  Q    Did you also run Defendant Vazquez' border crossings?

16  A    Yes, they were run.

17  Q    And what did you find when you ran the border crossings?

18  A    Crosses with frequency, every two to three days.

19  Q    Okay.

20               So, there were numerous border crossings?

21  A    Absolutely.

22  Q    And it looks like were there at least 12 just in the month

23  of September?

24  A    Yes, there were.  It's my understanding that he has kids

25  that attend school and live south of the border and a

1  girlfriend and stay with him on the weekend.

2  Q    Okay.  And at some point did any Agents go to

3  Defendant Vazquez' residence in Hidalgo, Texas?

4  A    Yes.

5  Q    Okay.  And also what have you learned about that

6  residence?  Is there a mortgage, or is that paid off?

7  A    Well, from what I understand, it's approximately a three

8  hundred-thousand-dollar residence, completely paid off.

9  Q    Okay.  And is there anything that you noticed about that

10 residence?

11 A    It's ornate; it's well-decorated; it's not – it's a – it's

12 a nice residence.

13                    Sorry.

14 Q    Does Defendant Vazquez have any other assets besides the

15 house?

16 A    Numerous vehicles.  But he turns vehicles quite quickly.

17 Q    What does that mean when you say, "turns vehicles"?

18 A    Either buys and sells.  It's tough to track, because he

19 doesn't seem to keep them very long.  But I know he has a –

20 and at least one other vehicle that he – that he has I think

21 is not registered in his name as well.

22             MS. STABE:  Your Honor, I'll pass the witness.

23             THE COURT:  All right.

24             You may cross examine.

25                         CROSS EXAMINATION

1   BY MR. PARRAS:

2   Q   Agent Sobin, I'm John Parras, and I represent

3   Mr. Villanueva.

4   A   Thank you.

5   Q   I'm going to start with the last set of questions you had.

6   First about the work history of Mr. Villanueva.

7   A   Yes, sir.

8   Q   You reviewed the Texas –

9   A   Workforce.

10  Q   -- Workforce Commission is what I'm saying.

11  A   That's all I remember, yes.

12  Q   Do you understand that – that they receive information

13  from employers of people that they hire for tax purposes and

14  for Worker's Comp purposes, correct?

15  A   Correct.

16  Q   But you also understand that the Texas Workforce

17  Commission is not required to receive information by

18  contractees or – by contractors for people that they contract

19  to work under them, correct?

20  A   Meaning what, people that are paid via 1099?

21  Q   Correct.

22  A   Yes, I'm aware.

23  Q   Okay.  So, if Mr. Villanueva is employed by a company that

24  pays him on a contract basis by 1099, that information would

25  not show up at the Texas Workforce Commission?

1   A    No, it would not.

2   Q    You also talked in respect to Mr. Vazquez that you had

3   researched information regarding the border crossings?

4   A    Yes.

5   Q    I assume you looked at the same data bases for information

6   about Mr. Villanueva and whether there were any border

7   crossings for Mr. Villanueva?

8   A    Absolutely and there were none.

9   Q    Absolutely was or absolutely –

10  A    And there were – absolutely I looked and there were no –

11  Q    -- there were no –

12  A    I did not see any.

13  Q    And the court reporter is going to get mad at us for

14  talking over each other.

15             But just to be clear, absolutely you looked and

16  absolutely there was no information that Mr. Villanueva had

17  crossed the border at any time.

18  A    In the recent history I did not see.

19  Q    Recent history being at least the last ten years, fifteen

20  years, twenty years, what is it?

21  A    Oh, I would be guessing at this point, but in answer to

22  your question I had not seen any border crossings.

23  Q    Okay.

24             With respect to prior offenses, okay?

25  A    Uh-huh.

1  Q    The two offenses that you found for Mr. Villanueva were

2  two federal marijuana convictions for which he has completed

3  his sentences, correct?

4  A    Uh-huh.

5  Q    For which there's no indication that he ever violated any

6  bond condition, if he was on bond, correct?

7  A    Uh-huh.

8  Q    There is one record that he had a supervised release

9  revocation on the very first conviction, correct?

10  A    I - if you say so.

11  Q    But did you notice that at least with respect to the

12  second conviction that he completed five years of supervised

13  release without any incident?

14  A    I think I did see that, and if I understand correctly, he

15  got an early release.  Correct?

16  Q    I don't know.  But he definitely had no revocation on the

17  supervised release for that most recent conviction.  Correct?

18  A    Right.  I didn't see one.  I thought there was an early

19  release for which had he not had the early release this would

20  have been a bigger problem.  But, yes, I think you are

21  correct.

22  Q    All right.  Now, turning to the facts of the case and the

23  strength of the case, I would like to ask you about

24  recordings.  All right?

25  A    Uh-huh.

1   Q   Video recordings or audio recordings?

2   A   Yes, sir.

3   Q   And let's start with the set of conversations that you

4   testified to between the Cooperating Source and a person in

5   the Valley regarding their initial trip down to the Valley to

6   get the Freightliner, correct?

7   A   Okay.

8   Q   Are those conversations recorded?

9   A   No, my recordings start – are not – that area is not

10  recorded, no.

11  Q   It's – are those recordings –

12  A   No.

13  Q   Are those conversations recorded?

14  A   No, they're not.

15  Q   Okay.

16              So, when you testified about the conversations

17  between the Cooperating Source and a person in the Valley

18  about going down to the Valley, you don't have any

19  information – or you don't have any recordings –

20  A   No.  Or debriefings.

21  Q   Then, the first indication that you have that a person,

22  Mr. Villanueva may be involved with your Cooperating Source is

23  the wire transfer, correct?

24  A   Putting a name to the person, yes.

25  Q   Okay.

1            And up until that point, had your Cooperating

2   Source identified his contact in the Valley?

3   A   Only as Silvano.

4   Q   "Only as Silvano," those particular words, that name

5   Silvano?

6   A   Only that name.

7   Q   Okay.

8            And when you say, "only that name," did he have

9   an associated telephone number?

10  A   Yes, he did – she did.

11  Q   Did he have any other associating information – address?

12  A   Historical addresses, I believe.

13  Q   Had your Cooperating Source seen this person, Silvano,

14  that they had – were reporting to you was asking them to go

15  down to the Valley?

16  A   Yes, on a prior trip.

17  Q   Was that a trip that was under your supervision?

18  A   Yes, it was.  And it was some time ago.

19  Q   And you say some time – months or years?

20  A   No, just less than a year, probably, but close to a year

21  ago.

22  Q   Okay.

23            Now, jumping ahead to the series of incidents

24  between the CS and Mr. Villanueva down in the Valley regarding

25  the Freightliner.

1    A    Yes, sir.

2    Q    Are any of those conversations recorded?

3    A    No, they're not.

4    Q    Were any of those occurrences surveilled by Agents?

5    A    No, they were not.

6    Q    When you testified that Mr. Villanueva handed a duffle bag

7    with cocaine to the CS, that testimony is based on what

8    information?

9    A    Two bags from the CS, debriefings of the CS.

10   Q    The CS is communications to you?

11   A    Yes.

12   Q    There are no picture of that?

13   A    No.

14   Q    There's no surveillance or eyewitness testimony that

15   they've seen that?

16   A    No, there's not.

17   Q    Do you have any information regarding the payments for or

18   the different items that occurred down in the Valley with

19   respect to the Freightliner, for example, registration,

20   insurance and inspection of the Freightliner?

21   A    Do I have receipts?

22   Q    Yes.

23   A    I don't believe so.  I have the documents.  I would have

24   to doublecheck if I had receipts, but I - I don't recall.

25   Q    Okay.  Do you have - were those incidents surveilled by

1    Agents?

2    A    No, they were not.

3    Q    All right.  The information that you have is that

4    Mr. Villanueva participated in those activities or that he

5    directed that they take place?

6    A    Directed and was present at a majority of them.

7    Q    What evidence do you have of Mr. Villanueva's involvement

8    in the order of the broccoli that was picked up at the produce

9    warehouse?

10   A    Again, the briefings of the CS.

11   Q    Okay.  Have you collected any documentary evidence on

12   that?

13   A    At the moment, no.

14   Q    Okay.  Now, going to the time period after the seizure of

15   the drugs and the series of conversations between the CS and

16   Mr. Villanueva or – but prior to the CS's trip to Love's

17   Truckstop, okay?

18   A    But prior to?

19   Q    Prior to.  Right?

20   A    Okay.

21   Q    Are any of those conversations recorded by you?

22   A    Every last one.

23   Q    Okay.  Now, let's talk about the events at the Love's

24   Truckstop.

25   A    Okay.

34

1   Q   Are those events recorded audio – by audio or by video?

2   A   They – there's photos.  I would have to doublecheck if

3   there's audio, but I don't think there is; Agent witnesses to

4   my knowledge.

5   Q   Okay.

6                Now, talking about the time – time period

7   between the end of the Love's Truckstop incident and up and to

8   the McDonald's incident.  Okay?

9   A   Yes.

10  Q   Those conversations.

11                Are those recorded?

12  A   Every last one.

13  Q   And now finally, at the McDonald's, are those

14  conversations recorded?

15  A   The physical conversation within the McDonald's, no, I

16  don't believe so; a meeting, yes, is Agent witnesses and

17  there's – there should be photos as well.

18  Q   Okay.  No videos to your knowledge.

19  A   To my knowledge I don't – I don't know that there is, no.

20  Q   Okay.

21                No further questions, Judge.

22          MR. WILLIAMS:  May I proceed, Your Honor?

23          THE COURT:  Yes.

24                        CROSS EXAMINATION

25  BY MR. WILLIAMS:

1   Q   I'm sorry I didn't –

2           THE COURT:  Please get closer to the microphone,

3   though.

4           MR. WILLIAMS:  Oh –

5           THE COURT:  Thank you.

6   BY MR. WILLIAMS:

7   Q   I was a little bit busy earlier; I didn't catch your –

8   your last name.

9   A   Sobin.

10  Q   So- --

11  A   Sobin, S-O-B-I-N.

12  Q   Agent Sobin, going all the way back to the beginning, did

13  the Confidential Source ever meet with Mr. Vazquez down in

14  McAllen?

15  A   He has no knowledge of Mr. Vazquez prior to the dealings

16  in Houston?

17  Q   Prior to what?

18  A   Houston.

19  Q   Okay.

20          Do you have any evidence that Mr. Vazquez

21  transferred any money to the Confidential Source at any time?

22  A   No, I do not.

23  Q   Do you have any evidence that Mr. Vazquez transferred any

24  drugs to the Confidential Source at any time?

25  A   No, I do not.

1   Q   Do you have any evidence that Mr. Vasquez was involved in

2   preparing the tractor trailer for transport?

3   A   No, I do not.

4   Q   Do you have any evidence that Mr. Vasquez was involved in

5   getting the broccoli from the warehouse or anything like that?

6   A   No, sir.

7   Q   Do you have any evidence that he was involved in preparing

8   the cover load at all?

9   A   No, sir.

10  Q   And did the Confidential Source contact Mr. Vazquez about

11  the seizure initially?

12  A   Mr. Vazquez?

13  Q   Yes.

14  A   No.

15  Q   Did the Confidential Source – are there – are there any

16  recordings between the Confidential Source and Mr. Vazquez

17  before the McDonald's?

18  A   No.

19  Q   Did the Confidential Source ever – ever meet with Mr.

20  Vazquez?

21  A   Never.

22  Q   Did the Confidential Source ever have any dealings that

23  you are aware of with Mr. Vazquez?

24  A   No.

25  Q   Other than the one conversation on the telephone with

1   Mr. Vasquez – and that was at the McDonald's, correct?

2   A    That was at the McDonald's in Rosenberg, correct.

3   Q    Okay.

4            And that was the only – that's the only recorded

5   phone call that you have between Mr. Vazquez and the

6   Confidential Source, correct?

7   A    Correct.

8   Q    Do you have any evidence that Mr. Vazquez ever received

9   any – any money from the Confidential Source?

10  A    No, I do not.

11  Q    Do you have any evidence that Mr. Vazquez transferred in

12  either direction drugs to the Confidential Source?

13  A    No, I do not.

14  Q    Do you have any evidence that Mr. Vazquez is this, quote,

15  unquote, Dallas guy?

16  A    The manner in which he spoke on the phone, the intent of

17  that person speaking next on the phone would be the Dallas

18  guy?  Other than those and the meeting was set up in

19  furtherance of a meeting with the Dallas guy, all things

20  pointed at Mr. Vazquez; that's all I have.

21  Q    Did – when Mr. Vazquez was on the phone, did he identify

22  himself as the Dallas guy?

23  A    I believe he was asked by the CS "if you are the Dallas

24  guy"; to which I believe he answered affirmatively, but I

25  would need to review it.

1   Q    And that call will be recorded?

2   A    That call's recorded.

3   Q    At the Rosenberg meeting, did – did the Confidential

4   Source ever – ever meet with Mr. Vazquez at the –

5   A    That's the same meeting we're talking – that's the

6   McDonald's still, correct?  But, yes, he – no, he has never

7   met with – she has never met with.

8   Q    So, he didn't meet with him at the Rosenberg meeting, the

9   Confidential Source?

10  A    No, that's the McDonald's nor at the Love's.

11  Q    When Mr. Vasquez was taken into custody, did he make any –

12  any written or oral or audio statements to the authorities,

13  the law enforcement?

14  A    At the time of custody that I do not – I do not know

15  nothing that's been documented.

16  Q    Okay.  And again, when you checked for any prior

17  convictions – I assume you checked for prior convictions for

18  Mr. Vazquez – did you find any?

19  A    Nothing in the recent –

20  Q    Okay.

21  A    -- history.

22  Q    And when you checked for his employment records, did you

23  check in just the one place?

24  A    Yes.

25  Q    Okay.

DIGITAL SCROLL TRANSCRIPTION                        281.382.9862

1               Did you check anywhere else, his tax returns or

2    anything like that –

3    A    No, I did not.

4    Q    -- to see where his income was?

5    A    No.

6    Q    Now, you said that Mr. Vazquez has a nice home in Hidalgo,

7    Texas; is that right?

8    A    I believe it's Hidalgo, but, yes.

9    Q    Okay.  And did you check the property records to see if it

10   was in his name?

11   A    I have not, but I was told that it's a mortgage that's

12   paid off.  Do I know if it's in his name?  I don't recall.

13   Q    Okay.

14               And you said he had a – a high number of cars.

15   Is it – can you clarify that a little bit?  Are you talking

16   three cars or ten?

17   A    At least three.  At least three.

18   Q    Okay.

19               Are they new cars or –

20   A    I believe they're mid- -- they're older models.

21   Q    Okay.

22               And is it common, I think, in the Valley that

23   the people buy older cars, fix them up and sell them and turn

24   them over to make money; it's rare – a fairly common type of

25   employment, right?


DIGITAL SCROLL TRANSCRIPTION                        281.382.9862

1  A   I would imagine so, but I really don't know.

2  Q   And did you check the – to see if Mr. Vazquez was a legal

3  permanent resident in the United States?

4  A   Yes, he's a legal resident.

5  Q   Okay.  So, he's in – he's in the country legally, correct?

6  A   Yes.

7  Q   Okay.

8                  And you said he goes back and forth across the

9  border fairly often; is that right?

10  A   Yes.

11  Q   Okay.  Are you aware that he has a family here, with six

12  children, U. S. citizen children; are you aware of that?

13  A   Yes, sir.

14  Q   And one of the children has Down Syndrome; did you know

15  that?

16  A   No, I do not.

17  Q   Do you know if he has any property or money or anything

18  like that in Mexico?

19  A   That I do not know.

20  Q   Did you check to see if he has any bank accounts here in

21  the United States?

22  A   I have not.

23  Q   So, the only property that you're aware of that

24  Mr. Vazquez has is – is the house in Hidalgo and the three

25  cars, right?

1   A    Correct.

2   Q    And do you have any evidence that he has any illegal

3   income from any source?

4   A    At the moment, no.

5   Q    When you arrested Mr. Vazquez – were you involved in the

6   arrest of Mr. Vazquez?

7   A    No, I was with the Cooperating Source.

8   Q    Okay.  When they took him into custody, did they find any

9   large amounts of money in his possession or in his car?

10  A    No, he was – they had multiple phones – flip – two flip

11  phones and a normal Smart phone, which is not common, but –

12  but, no, there was no large sum of money, just maybe five –

13  six hundred cash.

14  Q    Okay.  Any drugs?  Any – were there any drugs in the car?

15  A    No.

16  Q    Any, like, secret compartments or anything like that to

17  transport drugs?

18  A    No.

19  Q    Did you have – did he have any weapons on him or anything?

20  A    No.

21  Q    Have you ever known Mr. Vazquez to carry a weapon or

22  anything like that?

23  A    Not to my knowledge.

24          MR. WILLIAMS:  I'll pass the witness, Judge.

25          THE COURT:  Redirect?

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1          MS. STABE:  Briefly, Your Honor.

2                    REDIRECT EXAMINATION

3   BY MS. STABE:

4   Q    When - Agent Sobin, when Agents went into

5   Defendant Vazquez' home, was there any cash found in

6   Defendant Vazquez' home in Hidalgo?

7   A    Yeah, I think just shy of five thousand dollars in United

8   States currency.

9   Q    In cash?

10  A    Yes.

11         MS. STABE:  I'll pass the witness.

12         THE COURT:  Anything else?

13         MR. WILLIAMS:  No, Your Honor.

14         MR. PARRAS:  No, Judge.

15         THE COURT:  All right.

16             The witness is excused?

17         MS. STABE:  Yes, Your Honor.

18         THE COURT:  Thank you.

19             The witness is excused.

20         THE WITNESS:  Thank you, Your Honor.

21      (Excerpt of the proceedings at 10:58:30 a.m.)

22

23

24

25

1                    IN THE UNITED STATES DISTRICT COURT

2                     FOR THE SOUTHERN DISTRICT OF TEXAS

3                            HOUSTON DIVISION

4

5      I, Linda Griffin, court approved transcriber, certify that

6  the foregoing is a correct transcript from the official

7  electronic sound recording of the proceedings in the above-

8  entitled matter.

9

10 /s/ Linda Griffin                    July 6, 2021
   Linda Griffin                            Date
11 Digital Scroll Transcription

12

13

14

15

16

17

18

19

20

21

22

23

24

25